**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justin Harry Warshawsky, | No. CV-25-00104-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendant. | |

Plaintiff Justin Harry Warshawsky filed this lawsuit against the City of Phoenix ("Phoenix") after the Phoenix Police Department ("PPD") rescinded his conditional employment offer allegedly because Warshawsky is Jewish. (Doc. 26.) He alleges disparate treatment on the basis of religion. Phoenix has filed a motion for summary judgment, which is granted.

## I.      Factual Background

On October 18, 2022, Warshawsky was offered "conditional employment" with PPD to work as a crime scene specialist. (Doc. 68 at 18.) He signed a form that explained the offer was conditional and would be withdrawn if the background investigation revealed "any information indicating" Warshawsky was unfit for the position and/or if PPD determined he was "not the most qualified person for the position offered." (Doc. 68 at 18.) PPD typically hires "3 conditionals for every 1 position" that is open. (Doc. 71 at 67; *see also* Doc. 68 at 23.) For this position, Warshawsky was one of 18 candidates who received conditional offers for seven open positions. (Doc. 68 at 31.) He was at that point ranked

near the top of those candidates. (Doc. 68 at 31.)

As is typical, Warshawsky's information was forwarded to the Employment Services Bureau for a background investigation conducted by PPD detective English Quals. (Doc. 68 at 22-23, 129.) Quals reported to a sergeant and to Lieutenant Brian Hanania, and also worked with the civilian hiring manager for the position, Sherry Sickler. (Doc. 68 at 31, 129.) Background investigations are guided by eSOPH, a software program requiring the investigating detective to complete around 70 tasks, including reference checks. (Doc. 68 at 22, 130.) It is expected that not every conditional employee will pass that investigation. (Doc. 68 at 22.) After the investigation, a sergeant reviews the detective's results, informs the hiring manager about non-confidential findings, and sometimes provides a hiring recommendation. (Doc. 68 at 23.) The hiring managers rely "heavily" on the background investigators when making their final decisions. (Doc. 71 at 54.) Throughout this process, Warshawsky was informed about the background check's confidentiality, including specific protections for interviews with people the candidate knows. (Doc. 68 at 29.)

Warshawsky testified that during his first phone call with Quals, before she had begun the background investigation, she told him she "[didn't] believe [he] want[ed] to even work for the Phoenix Police Department" because he had applied to around 20 other agencies. (Doc. 68 at 110-11 (testifying he felt "belittle[d]").) As the process went on, Quals became concerned because Warshawsky had moved many times in a short period, though she considered the "totality" of his living arrangements. (Doc. 71 at 94-96, 102, 109.) Quals received reference forms from former landlords Mike McClain and Gina Galvan, as well as former roommate Ashley Slack. (Doc. 71 at 41-43.) All three said extremely negative things about Warshawsky. (Doc. 71 at 41-43.) She also received a positive personal reference from Joseph Cliffton which referenced Warshawsky's service at a synagogue. (Doc. 71 at 74-75.)

On November 1, 2026, she had phone calls with two of the landlords and heard

additional negative things about Warshawsky.[1] (Doc. 71 at 47.) She included in her report her notes from her conversation with Slack where Slack explained Warshawsky had failed to pay rent and had to be evicted. (Doc. 74-1 at 10.) Quals also recorded that Warshawsky's reasons for moving so many times contradicted the reasons his landlords provided. (Doc. 71 at 41.) The same day as those phone calls, Quals contacted Sickler and spoke with her about Warshawsky's application, without including confidential details. (Doc. 71 at 47-48, 106-07.) Sickler expressed her desire to rescind his conditional offer of employment. (Doc. 71 at 47-48.)

The background check continued afterwards; hiring managers often begin the process of rescinding an offer while the investigator completes their remaining steps. (Doc. 68 at 23.) During that time, Quals requested additional driving records from Warshawsky, which he contends were unnecessary. (Doc. 68 at 114-15; *see* Doc. 71 at 151 (Hanania testified Quals did not ask every candidate for full driving histories).) Warshawsky believes she became "belligerent" because she asked about those records after he had explained they were difficult to access. (Doc. 68 at 119-20.)

Quals testifies that at this point, she did not know Warshawsky's religion based on his last name or any other indication; she did not carefully read Cliffton's reference (Doc. 68 at 126) and would not have assumed the mention of a synagogue would mean Warshawsky was Jewish (Doc. 74-1 at 12). Warshawsky believes it is "common knowledge" that his last name is recognizably Jewish, but provides no evidence Quals actually knew his religion. (Doc. 68 at 109, 118 (testifying it is "an educated guess based on [his] life's experience" that anyone would know his name is Jewish).) He testified Quals and her managing sergeant never made any comments related to religion. (Doc. 68 at 88.)

---

[1] All told, the negative comments included that Warshawsky "never took showers or washed his clothes," had a "fascination with body parts," had "something about him that did not seem right," had a habit of "losing his temper and yelling . . . for no apparent reason," and had no friends. (Doc. 71 at 41-42.) He was fascinated by dark photographs of women in bondage and made women in particular feel uncomfortable. (Doc. 71 at 41, 44.) When asked whether he should work in a police department, one reference stated Warshawsky "should not be in any position with the police department where he is to be trusted," and the other stated he should not "be placed in a position with the police department." (Doc. 71 at 41-42.) Finally, when asked if they would rent to Warshawsky again, the references stated "no," "no," and "absolutely not." (Doc. 71 at 41-42.)

On November 7, 2023, Warshawsky was informed his "background does not meet the hiring standards" for PPD and his name would be removed from the list of eligible candidates.[2] (Doc. 71 at 62.) Warshawsky then sent emails to PPD that primarily focused on his belief that Phoenix had violated the Fair Credit Reporting Act ("FCRA") by not providing him a copy of his credit report. (Doc. 68 at 76, 78.) Warshawsky also stated his complaint was "solely due to misconduct and negligence by three members of the Phoenix PD attempting to cover up for each other." (Doc. 68 at 76.) At that time, it appears he believed the three individuals were covering up an FCRA violation. (Doc. 68 at 76, 78.) One email also stated "[t]here may also be Religious Discrimination involved." (Doc. 68 at 76.) On November 30, 2023, Warshawsky's complaint was forwarded to the Professional Standards Bureau, an employment unit which investigated and determined the complaint to be unfounded. (Doc. 68 at 68.) In 2024, he filed a complaint of employment discrimination with the Equal Employment Opportunity Commission and received a right-to-sue notice on September 9, 2024. (Doc. 26 at 10.) Quals testified she first learned Warshawsky was Jewish when he filed the Professional Standards Bureau complaint.[3] (Docs. 71 at 116; 74-1 at 13.)

Warshawsky sued Phoenix for employment discrimination on the basis of religion. He believes there was "no valid reason for [him] to fail a background check," so the fact he is Jewish must have been used against him in making the hiring decision. (Doc. 26 at 7.)

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] Though Warshawsky believes he is permanently ineligible for all Phoenix positions, a supervisor clearly communicated he was "not permanently disqualified." (Doc. 71 at 64.) Hanania testified Warshawsky would not be eligible for the crime scene specialist role with Phoenix in the future, but that is not reflected elsewhere in the record and at any rate does not constitute a permanent blanket ban. (Doc. 71 at 83.)

[3] Warshawsky takes issue with one of Quals's answers in her deposition: when he asked her, "Do you know that I'm Jewish?," she answered, "No." (Doc. 71 at 114.) Quals later clarified that statement multiple times and established she learned his Jewish identity when he filed the complaint. (Doc. 71 at 116.)

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Id*. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)). "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action" because of the plaintiff's protected characteristic. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

### III.    Analysis

Warshawsky alleges a disparate-treatment theory of religious discrimination. (Doc. 71 at 10.) Plaintiffs alleging disparate treatment must establish a prima facie case of discrimination either through "evidence of discriminatory intent" or by using the *McDonnell Douglas* framework. *Freyd v. Univ. of Ore*., 990 F.3d 1211, 1228-29 (9th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). In the context of a failure-to-hire claim, that framework asks a plaintiff to first show a prima facie case of discrimination consisting of (1) "belong[ing] to a protected class"; (2) being qualified for the position; (3) being rejected from the position; and (4) that similarly-situated people outside the protected class were treated favorably. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). The evidence required for a prima facie case

is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Once a plaintiff makes a prima facie case, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment action. *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017). If the defendant does so, the plaintiff can defeat summary judgment only by providing enough evidence that a reasonable jury could "conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's [religion]." *Cornwell*, 439 F.3d at 1028.

### A. Prima Facie Case

Warshawsky has not made a prima facie case of religious discrimination.[4] He fails the *McDonnell Douglas* elements because he has shown no evidence of the last prong—that similarly-situated individuals outside his protected class were treated more favorably than him. To make that showing, he must "identify" applicants outside his religion, and establish they were similarly situated to him in "all material respects"—including applying to similar roles and "display[ing] similar conduct"—and show they were given preferential treatment. *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1015 (9th Cir. 2018) (simplified); *see Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) ("individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects").

Warshawsky alleges he was treated differently than other job candidates because negative statements from references "carried significantly more weight in [his] background investigation [] compared to the background investigations of other job candidates."[5] (Doc.

---

[4] The motion for summary judgment focuses on Phoenix's argument Warshawsky must prove Phoenix knew he was Jewish in order to make a prima facie case. (Doc. 68 at 12.) For Title VII disparate treatment claims, a prima facie case generally requires the employer be aware of the plaintiff's protected characteristic. *See Garcia v. City of Everett*, 728 F. App'x 624, 627 (9th Cir. 2018); *but cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) ("unsubstantiated suspicion" of protected characteristic is sufficient). Warshawsky does not provide evidence Phoenix knew or suspected he is Jewish, but there is no need to determine the level of awareness the law requires because Warshawsky's response and the reply adequately present the parties' positions on other deficient aspects of his claim.

[5] He also quibbles with whether those witnesses were reliable, but does not dispute that they made the statements Quals reported (Doc. 71 at 5). It is "not improper" for employers

71 at 13.) But the only evidence supporting that conclusion is Hanania's testimony that he has hired job candidates despite some negative comments from references. (*See* Doc. 71 at 144-45.) Warshawsky does not even *identify* these other applicants, let alone make a showing they were similarly situated to him or had similar negative comments from references. *Campbell*, 892 F.3d at 1015. As it stands, those applicants could have been applying to different positions where references matter less, could have applied decades ago, or the negative comments in their reference checks could have been much less troubling than Warshawsky's—any one of which would mean they were not similarly situated.

Warshawsky also alleges Quals treated him differently than other candidates because she requested his complete drivers records rather than the typical three years' worth. (Doc. 71 at 14.) He points to Hanania's testimony establishing Quals does not ask "every single" candidate for their full driving histories. (Doc. 71 at 151.) But Hanania also stated it is common practice for investigators to start with three years of driving records and then request more based on other findings from the investigation. (Doc. 74-1 at 25-26.) And Quals directly testified that she treats all applicants consistently. (Doc. 74-1 at 8.) Warshawsky provides no evidence to dispute this fact. His inferential leap is not enough to satisfy the *McDonnell Douglas* framework. *Id*.

### B. Pretext and Credence

Even if Warshawsky had shown a prima facie case of religious discrimination, Phoenix has met its burden to provide a non-discriminatory reason for his rejection: the results of his background investigation meant he was not the most qualified candidate for the vacancy. (Doc. 71 at 41-43.) The burden then shifts to Warshawsky to provide enough evidence—either direct, or "specific and substantial" if circumstantial—that the discriminatory reason is "more likely" than the nondiscriminatory reason or the employer's explanation is pretextual or "unworthy of credence." *Coghlan v. Am. Seafoods Co. LLC*., 413 F.3d 1090, 1094-95 (9th Cir. 2005); *see Blair v. Shulkin*, 685 F. App'x 587, 588 (9th

to rely on recommendations in making employment decisions. *See Merrick v. Farmers Ins. Grp*., 892 F.2d 1434, 1437 (9th Cir. 1990).

- 7 -

Cir. 2017). The plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Bostock v. Clayton Cnty*., 590 U.S. 644, 665 (2020). And generally, plaintiffs alleging employment discrimination need produce "very little evidence" to overcome an employer's motion for summary judgment because the inquiry is best-suited for a factfinder. *Chuang v. Univ. of California Davis, Bd. of Trs*., 225 F.3d 1115, 1124 (9th Cir. 2000); *see also Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019).

Warshawsky does not argue there is direct evidence of discriminatory intent (Doc. 71 at 11), meaning he must instead provide "specific and substantial" circumstantial evidence that the nondiscriminatory rationale was pretextual or less likely than discrimination. *Coghlan*, 413 F.3d at 1094-95. He offers a few arguments for pretext. One is that the hiring decision was made with "suspicious timing" (Doc. 71 at 11) because Quals told the hiring manager Warshawsky had not passed the background investigation but continued to complete that investigation (Doc. 71 at 39, 47, 180-81). It is unclear why that is "suspicious" in light of uncontroverted evidence that investigators commonly communicate negative results to hiring managers before the investigation is complete so the managers can begin the process of rescinding an offer while the investigator completes the 70 tasks required to officially conclude the background investigation. (Doc. 68 at 23, 130; *see also* Doc. 74-1 at 28 (communication with hiring managers occurs throughout the investigation).) He also argues it is suspicious Quals rejected him a few days after receiving a reference check that discussed his service at a synagogue. (Doc. 71 at 11.) But that timing does not contradict Phoenix's explanation that he was rejected due to negative references, which were obtained the same day Quals contacted the hiring manager. (Doc. 71 at 44.)

Warshawsky also believes he *was* the most qualified candidate. To support this, he points to an email the hiring manager sent before the background investigation that ranked him second out of the prospective candidates. (Doc. 68 at 31.) That does not create a dispute of material fact because the email was sent before Phoenix knew the results of the background investigation. Additionally, and somewhat confusingly, Warshawsky asserts

that because there were seven open positions, the requirement that applicants be the most qualified person for the role did not apply and Phoenix's rationale was therefore pretextual. (Doc. 71 at 11, 24.) Nothing supports that interpretation. Warshawsky was one of 18 candidates for seven open positions (Doc. 68 at 31), so his qualifications were necessarily subject to review. And he provides no evidence for his assertion that the roles remained open after his rejection. (Doc. 71 at 11.)

Warshawsky also cites as circumstantial evidence an email he wrote claiming Quals had called Cliffton and asked "how religious" Warshawsky is. (Doc. 68 at 51.) He cites an email from Cliffton which mentioned his answers as a reference, but it does not state or imply Cliffton had received a call from Quals. (Doc. 71 at 71.) In fact, Warshawsky himself contradicts that such a call happened in stating multiple times Quals "did not make a single call to references" or friends. (Doc. 68 at 85, 86; *but see* Doc. 71 at 91-92 (former landlady testified she received call for reference check).) Parties "cannot generate an issue of material fact by providing contradictory statements." *Oliver v. Keller*, 289 F.3d 623, 629 (9th Cir. 2002).

Finally, Warshawsky attempts to show discriminatory intent by alleging Quals fabricated statements and placed them in his background investigation file intending to hurt his future employment prospects. (Doc. 71 at 15.) He points to Quals's notes from her conversation with his former roommate where Quals recorded that former roommate had said Warshawsky failed to pay rent. (Doc. 71 at 42.) His allegation is purely speculative; there is no evidence the statement was fabricated or that future prospective employers could even access Phoenix's background investigation file. That is not sufficient to avoid summary judgment. *Hollamon v. City of Los Angeles*, 709 F. Supp. 3d 992, 998 (C.D. Cal. 2023), *aff'd,* No. 24-341, 2025 WL 927310 (9th Cir. Mar. 27, 2025) ("Arguments based on conjecture or unfounded belief do not raise a genuine issue of material fact.").

Ultimately, Warshawsky's position in this case seems to rely on his belief that "given what it took for [him] to logically make it this far in the job application process, no reasonable person could ever interpret Quals's reason for rejection ([negative references])

to be anything other than fiction." (Doc. 71 at 15.) But "subjective personal judgments of [plaintiff's] competence alone do not raise a genuine issue of material fact" as to an employer's non-discriminatory rationale. *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir. 1996). A reasonable jury could not conclude by a preponderance of the evidence Quals rejected Warshawsky's candidacy because he is Jewish. *Cornwell,* 439 F.3d at 1028.

### IV.    Conclusion

Because Warshawsky did not make a prima facie case or rebut Phoenix's nondiscriminatory rationale with a genuine dispute of material fact, summary judgment is warranted.

Accordingly,

**IT IS ORDERED** Phoenix's Motion for Summary Judgment (Doc. 68) is **GRANTED**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in favor of defendant and close this case.

Dated this 7th day of August, 2026.

Honorable Krissa M. Lanham
United States District Judge